# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KATHERINE LEES,

        Plaintiff,

    -vs-                                           Case No. 10-C-86

CARTHAGE COLLEGE,
LEXINGTON INSURANCE COMPANY,

        Defendants.

# DECISION AND ORDER

In the fall semester of her freshman year at Carthage College, Katherine Lees was sexually assaulted in her dorm room. Ms. Lees alleges that Carthage's failure to provide adequate security caused her assault. Carthage moves for summary judgment and to exclude the testimony of Ms. Lees' expert witness. For the reasons that follow, these motions are granted.

## BACKGROUND

Carthage College is a four year private college of the arts and sciences. The total enrollment of full time students is generally between 2,000 and 3,000. Approximately 1,500 students reside on campus, which is located along the shores of Lake Michigan, just north of the city of Kenosha.

Katherine Lees is a resident of California. Ms. Lees is hearing impaired, but she can vocalize, and those familiar with her can understand her speech. Ms. Lees began her academic career at Carthage in the fall semester of 2008. She received a scholarship to

attend Carthage and sought out the school because of its water polo team. She lived on campus in Tarble Hall, an all-female residence hall, one of nine residence halls on campus.

During an orientation at Tarble Hall, the residents stood up, introduced themselves to each other, talked about their hobbies and interests, and then went down to the lake to pick out a rock to use as a "door stop" for their dorm doors. The resident assistants (RAs) encouraged the Tarble residents to use a rock to prop their doors open when they were in their rooms so they could mingle and get to know other residents. Tarble Hall is the only dormitory at Carthage that boasts about its "open door" policy.

In the early morning hours of September 21, 2008 (Saturday night/Sunday morning), Ms. Lees was sitting in a chair in her room with the door open while she watched television. Shortly after midnight, Ms. Lees saw two young men that appeared to be fellow Carthage students enter the doorway of her room and say something to her. Ms. Lees could not hear what they were saying so she tried to tell them that she was deaf. The two men laughed and walked away. A short time later, around 12:30 a.m., the two men returned. One of the men entered the room, went to the window and closed the curtain. The other turned off the light and closed the door. One of the men then raped Ms. Lees as the other man held her down by her shoulders.[1] Lees fought back when the second man attempted to assault her, punching him in the face hard enough to draw blood. This caused both men to flee the room.

Ms. Lees has consistently maintained that the men who raped her were Carthage students. She bases this belief on the fact that one of the men was wearing a "Carthage

---

[1] Carthage does not concede that the assault took place, but whether the assault actually occurred is irrelevant for purposes of this decision and order.

-2-

Football" sweatshirt, while the other had a "Carthage" t-shirt. Carthage initiated an internal college judicial proceeding, but the assailants were never identified. As a result of the assault, Ms. Lees continues to suffer from post-traumatic stress disorder. She is no longer enrolled at Carthage College.

Pursuant to federal law, Carthage reported the following number of forcible sexual offenses for each year: 2008 - 4; 2007 - 5; 2006 - 1; 2005 - 1; 2004 - 0; 2003 - 1. All of these incidents were acquaintance assaults (also known as date rape), meaning that the victim was in some way an acquaintance of the perpetrator. None of these incidents involved the victim being assaulted by a stranger. Carthage College has never had a reported instance of a student raped by a stranger or intruder in its residence halls. There is only one instance of stranger rape ever occurring on campus, and that was approximately 10 years ago. That incident involved a stranger rape in the music hall by a non-student, a serial rapist who would travel from campus to campus under the guise of a comedy show and sexually assault women. This individual was apprehended and criminally prosecuted due to the incident at Carthage.

Entrance doors to all of the residence halls at Carthage are locked 24 hours a day. In order to gain access to the residence halls, a Carthage student ID must be swiped through a card reader. The established policy at Carthage is that all students are allowed access to the residence halls from 8:00 a.m. to 2:00 a.m. on Fridays and Saturdays. Any student with a valid student ID is allowed to enter any dormitory during these hours by swiping his or her ID through the door access reader, which in turn unlocks the door and allows the student

access to the building. This means that students who did not live at Tarble Hall could gain access to Tarble Hall and roam the dormitory without a resident escort during the hours of 8:00 a.m. to 2:00 a.m. on Fridays (into Saturday morning) and Saturdays (into Sunday morning). After visitation hours the computerized system will read the card swipe and record the student's name and attempted entry, but it will not unlock the door for an unauthorized student that is not a resident of that particular residence hall. Unlike all of the other doors in the building, the basement door at Tarble Hall did not have a prop alarm. The basement door also did not have a card reader because it could not be opened from the outside.

## ANALYSIS

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003).

A negligence claim in Wisconsin[2] has four general elements: (1) the existence of a duty of care on the part of the defendant; (2) a breach of that duty of care; (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury; and (4) actual loss or damage resulting from the injury. *Hornback v. Archdiocese of Milwaukee*, 752 N.W.2d 862, 867 (Wis. 2008). Duty of care is established "whenever it was foreseeable to the defendant that his or her act or omission to act might cause harm to some other person." *Gritzner v. Michael R.*, 611 N.W.2d 906, 912 (Wis. 2000). This inquiry involves an "assessment of what ordinary care requires under the circumstances." *Hocking v. City of Dodgeville*, 768 N.W.2d 552, 556 (Wis. 2009). Duty "arises from probabilities, rather than from bare possibilities of injury. Failure to guard against the bare possibility of injury is not actionable negligence." *Grube v. Moths*, 202 N.W.2d 261, 266 (Wis. 1972).

Duty and breach are best understood in the context of the applicable standard of care. Potential tortfeasors must "conform to a certain standard of conduct to protect others against unreasonable risks." *Tesar v. Anderson*, 789 N.W.2d 351, 355 (Wis. Ct. App. 2010). Expert opinions are generally necessary to establish the standard of care in "those matters involving special knowledge or skill or experience on subjects which are not within the realm of the ordinary experience of mankind, and which require special learning, study or experience." *Payne v. Milwaukee Sanitarium Found., Inc.*, 260 N.W.2d 386, 393 (Wis. 1977). Both

---

[2] The parties agree that Wisconsin law governs this diversity action. The Court may exercise diversity jurisdiction because the amount in controversy exceeds $75,000 and the parties are completely diverse. 28 U.S.C. § 1332(a). Ms. Lees is from California, Carthage College is incorporated in Illinois and conducts business in Wisconsin, and Lexington Insurance Company (which issued a Commercial General Liability insurance policy to Carthage) is incorporated in Massachusetts. RSUI Indemnity Company, recently dismissed from this lawsuit, is a New Hampshire corporation doing business in Georgia.

parties agree that this case requires the use of expert testimony to establish the standard of care. As Judge Posner observed in a case alleging inadequate security at a hotel: "It is one thing for a jury unaided by expert testimony, empirical data, or other fruits of exact inquiry to assess the care with which the defendant in an automobile accident case drove, for that is something with which almost all jurors are familiar; it is another thing for a jury to determine the right standard of care to which to hold a hotel." *Shadday v. Omni Hotels Mgt. Corp.*, 477 F.3d 511, 515 (7th Cir. 2007); *Varner v. Dist. of Columbia*, 891 A.2d 260, 267 (D.C. 2006) ("expert testimony is required to establish the standard of care in negligence cases . . . which involve issues of safety, security and crime prevention"). Without such testimony, "the jury has no standard which enables it to determine whether the defendant failed to exercise the degree of care and skill required of him." *Olfe v. Gordon*, 286 N.W.2d 573, 576 (Wis. 1980). It is the plaintiff's burden to establish the standard of care. *Carney-Hayes v. NW Wis. Home Care, Inc.*, 699 N.W.2d 524, 537 (Wis. 2005).

Ms. Lees' expert, Dr. Daniel Kennedy, is Professor Emeritus at the University of Detroit, where he taught criminology and security administration for over thirty years. Dr. Kennedy was retained to analyze this lawsuit "from the perspective of a criminologist specializing in security issues and to comment on any negligence issues which might arise." D. 71-2. Dr. Kennedy writes that "an assault on a female dorm resident was generally foreseeable given prior history, perimeter failures, and visitation and staffing policies at Tarble Hall. Had this foreseeability been recognized and the security deficiencies described above been rectified, it is more likely than not the sexual assault against Katherine Lees

would not have taken place." *Id.* Dr. Kennedy later explained that "unreasonable access was granted through the visitor policy, the 'open door policy,' and the lack of an electronic lock/door prop alarm on the basement door. Thus, it was clearly foreseeable that with such access, stranger-on-stranger rape could and eventually would occur." D. 71, Affidavit of Daniel Kennedy, ¶ 18.

Dr. Kennedy cites to the "recommended practices" of the International Association of Campus Law Enforcement Administrators (IACLEA). For example, the IACLEA recommends that dormitory doors have prop alarms and that dorm guests be escorted by residents. However, the IACLEA recommendations are just that – recommendations. "Recognizing that academic environments vary widely – as do the safety and security risks they experience – *these recommended practices are not intended to serve as a formal security code or set of standards*. Rather, they are designed to represent optimum crime prevention practices for colleges and universities. Although crime prevention practices are recommended, institutions may elect to develop appropriate alternatives to these recommendations." *The Complete Campus Crime Prevention Manual*, International Association of Campus Law Enforcement Administrators, 1996 (emphasis added). The measures recommended by the IACLEA are merely "[a]spirational practices" that "do not establish the standard of care which the plaintiff must prove in support of an allegation of negligence." *Varner*, 891 A.2d at 272.

The IACLEA recommendations do not establish a standard of care for universities across the country because, as the authors recognize, "academic environments vary widely."

For example, the appropriate security measures at the University of Wisconsin-Madison, with an enrollment of over 40,000 students, are different from the required amount of security at Marquette University, an urban campus with 11,000 students. And of course, the standard of care for security is different at Carthage College, a much smaller school just north of a relatively large city (Kenosha's population is approximately 90,000), but isolated from that city along the shores of Lake Michigan. At his deposition, Dr. Kennedy admitted that he did not analyze the security measures at colleges similar to Carthage in forming his opinion that Carthage's security procedures were deficient. He explained that "when it comes to security, what other folks do or don't do may be of interest, but they do not – if everybody was engaged in poor security practices, we would not then say, oh, well, since everybody else does it poorly, then this particular campus is okay to do it poorly." D. 65-1 at 67-69. Carthage cannot be held liable in tort simply because its security measures aren't the best they can possibly be, or don't live up to the aspirational standard posited by Dr. Kennedy. *Shadday*, 477 F.3d at 515, 518; *see also Grdinich v. Bradlees*, 187 F.R.D. 77, 82 (S.D.N.Y. 1999); *Messina v. Dist. of Columbia*, 663 A.2d 535, 540 (D.C. 1995); *Sears, Roebuck and Co. v. Midcap*, 893 A.2d 542, 544-45 (Del. 2006).

Carthage was only required to take "precautions commensurate with the danger" to its students from criminals. *Shadday* at 514. Indeed, the applicable standard of care is directly informed by foreseeability because the "amount of care to take is a function of the danger that care would avert." *Id.* at 515. Dr. Kennedy's opinion that the security at Tarble Hall should have been improved is based on his corresponding conclusion that the attack on

Ms. Lees was foreseeable. This is an unreliable conclusion, which means that Dr. Kennedy's testimony on the standard of care is inadmissible. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) (expert testimony can be excluded based on judicial determination of reliability); Fed. R. Evid. 702; *Stutzman v. CRST, Inc.*, 997 F.2d 291, 294 (7th Cir. 1993) (Federal Rules of Evidence govern the admissibility of expert testimony in diversity cases).

Dr. Kennedy maintains that Ms. Lees' assault was foreseeable in light of the increase in sexual assaults at Carthage College in 2007 and 2008. However, it is undisputed that these were instances of acquaintance rape, not stranger rape. Acquaintance rape involves two people who know each other and/or are voluntarily in each other's presence. Therefore, acquaintance rape cannot be prevented through increased physical security measures. Instead, acquaintance rape is addressed by educating male and female students about how to avoid dangerous situations. "College students are still open to new ideas; thus sexual assault prevention messages need to be provided to male and female college students early and frequently. New students can be provided with information at orientation about the many consequences of heavy drinking, including sexual assault." Antonia Abbey, *Alcohol-Related Sexual Assault: A Common Problem among College Students*, Journal of Studies on Alcohol, Supp. No. 14, 2002, at 127. A reasonable person exercising ordinary care would not implement increased security measures in response to a problem that cannot be prevented through increased security. "Ordinary care involves the concept of foreseeability, in that a reasonable person exercising ordinary care would have foreseen injury as a consequence of his act." *Hoida, Inc. v. M & I Midstate Bank*, 717 N.W.2d 17, 29 (Wis. 2006).

Dr. Kennedy states generally that rape by a stranger was foreseeable because there are a sufficient supply of sexual offenders on a college campus. Dr. Kennedy concedes that the prevailing problem on college campuses is acquaintance rape, not stranger rape. Bonnie Fisher, *The Sexual Victimization of College Women*, The National Institute of Justice, Bureau of Justice Statistics, Dec. 2000, at 17 (9 in 10 offenders were known to the victim); Abbey at 119 (same). Dr. Kennedy attempts to link the prevalence of acquaintance rape with the foreseeability of stranger rape by citing studies which conclude that 30-35% of male subjects would commit a rape if they "thought they could get away with it." Neil M. Malamuth, *Rape Proclivity Among Males*, Journal of Social Issues, Vol. 37, No. 4, 1981, at 4; Rachel Lev-Wiesel, *Male University Students' Attitudes Toward Rape and Rapists*, Child and Adolescent Social Work Journal, Vol. 21, No. 3, June 2004. Yet none of the studies cited by Dr. Kennedy focus on the distinction between assaulting a stranger and assaulting an acquaintance. For instance, according to one article, "[c]ultural expectations that partygoers drink heavily and trust party-mates become problematic when combined with expectations that women be nice and defer to men. Fulfilling the role of the partier produces vulnerability on the part of women, which some men exploit to extract non-consensual sex." Elizabeth A. Armstrong, *Sexual Assault on Campus: A Multilevel Integrative Approach to Party Rape*, Social Problems, Vol. 53, Issue 4, 2006, at 484. Dr. Kennedy does not explain how it is foreseeable that a male college student who exploits the use of alcohol to assault someone he met at a party would also exploit lax security measures to assault a complete stranger in her dorm room. It simply does not follow that stranger rape is foreseeable based upon the

-10-

general prevalence of acquaintance rape. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Dr. Kennedy also focuses on the vulnerability of Ms. Lees in light of her disability. The article cited by Dr. Kennedy concludes that women with disabilities are four times more likely to be sexually assaulted than women without disabilities. Sandra L. Martin, *Physical and Sexual Assault of Women with Disabilities*, Violence Against Women, Vol. 12, No. 9, Sept. 2006. This *comparative* study says nothing about how likely it is that a female college student with a hearing disability would be raped by a stranger in her dorm room. Moreover, the study explicitly acknowledges that women with hearing impairments were under-represented in the study. *Id.* at 835 ("Another concern is that women with particular types of disabilities may not be likely, or able, to participate in telephone surveys (e.g., *women with communication impairments who use text telephones (TTYs)* . . .") (emphasis added). Once again, there is no reliable link between Dr. Kennedy's conclusion and the data underlying his opinion. "It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support. . . . The court is not obligated to admit testimony just because it is given by an expert." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003).

-11-

Finally, Ms. Lees relies upon cases from a variety of jurisdictions to support her argument that sexual assault in a college dorm room is foreseeable. *See, e.g., Stanton v. Univ. of Me.*, 773 A.2d 1045 (Me. 2001); *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112 (2d Cir. 2006); *Mullins v. Pine Manor Coll.*, 449 N.E.2d 331 (Mass. 1983). At best, these cases merely stand for the proposition, unremarkable under Wisconsin case law, that colleges owe their students a duty of care to provide a safe living environment. *Tesar*, 789 N.W.2d at 355 (explaining that in Wisconsin, "everyone owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others") (citing *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 102 (1928) (Andrews, J., dissenting)). For example, in *Stanton*, the Maine Supreme Court found that sexual assault in a college dorm room is foreseeable, but the court also remanded for further proceedings on whether the university breached its duty of due care. In *Williams*, the Second Circuit, applying New York law, found that the plaintiff created an issue of fact on breach and the duty of care. And in *Mullins*, the Massachusetts Supreme Court found that the evidence was sufficient to support a jury verdict that the college's duty of care extended to the plaintiff, and that the college breached its duty of care. Here, the dispositive issue is whether Ms. Lees, through the expert testimony of Dr. Kennedy, created a genuine issue of fact as to the scope of Carthage College's duty and whether that duty was breached – i.e., the applicable standard of care. Because Dr. Kennedy's testimony does not meet the standard governing the admissibility of expert testimony in federal court, Ms. Lees' case cannot survive summary judgment.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. Carthage College's motion for summary judgment [D. 63] is **GRANTED**;

2. Carthage's motion to exclude the expert testimony of Dr. Kennedy [D. 61] is **GRANTED**;

3. Carthage's motion to strike [D. 82] is **DENIED** as moot;

4. Plaintiff's motion to strike [D. 87] is **DENIED** as moot; and

5. This matter is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of August, 2011.

        **BY THE COURT:**

        *s/ Rudolph T. Randa*
        **HON. RUDOLPH T. RANDA**
        **U.S. District Judge**